UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NAJARIAN HOLDINGS LLC, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>COREVEST AMERICAN FINANCE LENDER LLC,<br><br>Defendant. | Case No. 20-cv-00799-PJH<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 75, 76 |

Plaintiffs' motion for partial summary judgment and defendant's motion for summary judgment came on for hearing before this court on November 18, 2021. Plaintiffs appeared through their counsel, Jeff Reich. Defendant appeared through its counsel, Emil Petrossian and Catherine R. Noble. Having read the papers filed by the parties and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court hereby rules as follows.

**I.   BACKGROUND**

Plaintiffs Najarian Capital LLC ("Najarian Capital") and Najarian Holdings LLC ("Najarian Holdings") purchase homes and "flip" them to third-party purchasers, usually after renovating them. Dkt. 75-1 at 105, 133, 222-224. Both entities are owned and managed by Zareh Najarian. Defendant CoreVest American Finance Lender LLC ("CoreVest") is successor to CAF Lending, LLC ("CAF"), a former lender to plaintiffs.

**A.   2014 Loan Agreements and Promissory Notes**

From August 2014 to approximately mid-2017, plaintiffs received hundreds of short-term loan advances from CAF to finance their purchases of hundreds of residential

properties. Dkt. 75-1 at 134-135, 215. CAF issued these loan advances to plaintiffs following their execution of two sets of identical Revolving Loan Agreements executed in August 2014 (for Najarian Capital) and October 2014 (for Najarian Holdings) (collectively, the "2014 Loan Agreements"). Dkt. 75-1 at 6-48, 58-93.

Each of the 2014 Loan Agreements established a $5 million revolving credit facility for the corresponding plaintiff. Dkt. 75-1 at 6-48, 58-93. Each agreement was accompanied by a Revolving Promissory Note Secured by Deeds of Trust (the "2014 Promissory Notes"). The 2014 Promissory Notes were executed at the same time by the same parties, and they concerned the same revolving loan transactions as the 2014 Loan Agreements. Dkt. 75-1 at 112.

Each of the 2014 Loan Agreements defined the $5 million credit facility as the "Loan," but the actual property-specific loan disbursements were called "Advances." Dkt. 75-1 at 9, 15, 61, 67. CAF had the right, at its sole discretion, to issue Advances up to the maximum Loan amount of $5 million. Dkt. 75-1 at 15, 67. Because plaintiffs used the Advances to finance their purchases of specific residential properties, CAF collateralized each Advance by recording a security lien on the corresponding residential property through the applicable county recorder's office. Dkt. 75-1 at 124-125, 160, 300.

When plaintiffs were ready to pay off the principal loan balance of an Advance they had obtained to purchase a property, CAF's third-party loan servicer, Cohen Financial ("Cohen"), would send them a payoff statement. Dkt. 77 at 2; Dkt. 75-1 at 127-28, 185-86, 193. Each payoff statement detailed the total amount plaintiffs had to pay to satisfy their obligation to repay the Advance in full, and each payoff statement included an itemized breakdown of all outstanding interest amounts and fees. Dkt. 75-1 at 139-141, 175. Among the fees charged on each Advance at the time of repayment and appearing on every payoff statement was a $250 document processing and lien release fee (the "release fee"). Dkt. 77 at 2.

//

//

**B.     Release Fees**

Section 3.3 of each 2014 Promissory Note ("Section 3.3") provided:

> Borrower shall pay to Lender all other fees as and when required pursuant to the Loan Documents. In addition to any Cash Advance Fee, Borrower shall pay to Lender, on or prior to closing of the Loan, all closing costs and other fees and expenses incurred by Lender in connection with the Loan (including appraisal fees, title insurance premiums, escrow fees, recording fees, cost review and legal fees), as more particularly set forth in Section 10.8 of the Loan Agreement.

Dkt. 75-1 at 51, 96.  The 2014 Loan Agreements defined the term "Loan Documents" to mean, among other things, all "agreements, documents or instruments now or hereafter evidencing, guarantying, securing or otherwise executed in connection with . . . any and all Advances made hereunder."  Dkt. 75-1 at 12, 64.  Section 10.8 of the 2014 Loan Agreements ("Section 10.8") obligated plaintiffs to "pay on demand all costs and expenses of Lender in connection with the negotiation, preparation, execution, delivery, administration, waiver and enforcement of the Loan Documents."  Dkt. 75-1 at 37, 87.  The 2014 Loan Agreements defined the term "Lender" broadly to encompass not only CAF, but also "its successors and assigns."  Dkt. 75-1 at 11, 15, 63, 65.  CAF had the right to "assign to one or more assignees all or a portion of its rights and obligations under the" 2014 Revolving Loan Agreements without plaintiffs' prior written consent. Dkt. 75-1 at 36, 86.

Plaintiffs paid a $250 release fee on hundreds of Advances from 2014 to 2017.  Dkt. 75-1 at 207-09, 303-04.  Plaintiffs acknowledged that they did not complain that the release fee was unauthorized in the nearly three years during which they paid it hundreds of times.  Dkt. 75-1 at 303-04.  Plaintiffs' sole and managing member, Zareh Najarian, testified that plaintiffs' sole complaint regarding the fee was that it was too high.  Dkt. 75-1 at 126.

**C.     Late Charges**

For each Advance they received from CAF, plaintiffs were obligated to pay monthly interest-only payments at the agreed-upon rate of eight percent (8%) per annum.

3

Dkt. 75-1 at 50, 95. Because plaintiffs made interest-only payments on the Advances, they had to pay off the entire principal loan balance of each Advance when it matured. Dkt. 75-1 at 136. For the monthly interest-only payments, the relevant language appears in Section 6.2 of the Note:

> 6.2. If all or any portion of any payment or deposit required hereunder is not paid or deposited on or before fifteen (15) days following the day on which such payment or deposit is due, Borrower shall pay a late or collection charge, as liquidated damages, equal to ten percent (10%) of the amount of such unpaid payment or deposit. Borrower acknowledges that Lender will incur additional expenses as a result of any late payments or deposits hereunder, which expenses would be impracticable to quantify, and that Borrower's payments under this Section 6.2 are a reasonable estimate of such expenses.

Dkt. 75-1 at 53. And in the case of an Advance not repaid upon maturing, plaintiffs were obligated to pay a going-forward default interest rate "equal to the lesser of (a) the [original] Interest Rate plus twelve percent (12%), or (b) the highest rate permitted by law". Dkt. 75-1 at 53. The parties refer to these two distinct charges as either the late fees or the "Late Charges."

From August 2014 to approximately mid-2017, plaintiffs obtained hundreds of Advances from CAF to finance their purchases of residential investment properties. Dkt. 75-1 at 107-08, 304. During this time period, plaintiffs consistently failed to timely pay monthly interest payments on existing Advances and to timely repay matured Advances by the applicable due dates, routinely admitting fault. Dkt. 75-1 at 159-160, 170-71, 230, 243-44, 247-48, 251, 257. As a result, CAF assessed and charged certain Late Charges. Dkt. 75-1 at 144-45, 164-65.

**D.    2015 Agreement**

Najarian Holdings entered into a new loan agreement with CAF on October 1, 2015 (the "2015 Loan Agreement"). Dkt. 75-2 at 6-60. The 2015 Loan Agreement was governed by New York law. Dkt. 75-2 at 54. Concurrently with the execution of that agreement, Najarian Holdings, together with plaintiffs' sole and managing member, Mr. Najarian, entered into a First Amendment to Revolving Loan Agreement, Promissory

4

1  Note and Other Loan Documents and Guarantor Consent and Reaffirmation also dated
2  October 1, 2015 (the "First Amendment"). Dkt. 75-2 at 61-69. The First Amendment
3  contained a comprehensive general release pursuant to which Najarian Holdings and Mr.
4  Najarian, on behalf of themselves and their affiliates, irrevocably released all then-
5  existing claims or potential claims against CAF and its successors (the "2015 Release").
6  Dkt. 75-2 at 64-65. All Advances that CAF issued to Najarian Holdings after October 1,
7  2015 were made pursuant to the 2015 Loan Agreement. Dkt. 75-2 at 62-63.

### E. Procedural History

On February 3, 2020, plaintiffs Najarian Holdings LLC and Najarian Capital LLC (collectively "Najarian" or "plaintiffs") initiated this lawsuit, alleging five causes of action. Dkt. 1. The parties stipulated to plaintiffs filing both an amended complaint (Dkt. 19) and a second amended complaint, (Dkt. 22). On July 9, 2020, the court granted in part and denied in part defendant's motion to dismiss (Dkt. 38), and plaintiffs filed a Third Amended Complaint ("TAC," Dkt. 39). The TAC alleges five causes of action: (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; (3) fraud; (4) negligent misrepresentation; and (5) unfair competition. The court granted in part defendant's motion to dismiss the TAC, specifically permitting plaintiffs to proceed on their "first claim for breach of contract and second claim for breach of the covenant of good faith and fair dealing to the extent the claim is not duplicative of plaintiffs' first claim." Dkt. 55 at 18. All other claims, including those for fraud, negligent misrepresentation, and unfair competition, were dismissed with prejudice. Dkt. 55 at 17.

Both parties filed the instant motions on September 23, 2021. Dkt. 75 (defendant) and 76 (plaintiffs). Defendant asks for summary judgment. Dkt. 75. Plaintiff asks for partial summary judgment on the issue of defendant's liability. Dkt. 76.

## II. DISCUSSION

### A. Legal Standard

A party may move for summary judgment on a "claim or defense" or "part of . . . a claim or defense." Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there

5

is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Id.

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Material facts are those that might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. Id.

Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). On an issue where the nonmoving party will bear the burden of proof at trial, the moving party may carry its initial burden of production by submitting admissible "evidence negating an essential element of the nonmoving party's case," or by showing, "after suitable discovery," that the "nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc., 210 F.3d 1099, 1105-06 (9th Cir. 2000); see also Celotex, 477 U.S. at 324-25 (moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case).

When the moving party has carried its burden, the nonmoving party must respond with specific facts, supported by admissible evidence, showing a genuine issue for trial. Fed. R. Civ. P. 56(c), (e ). But allegedly disputed facts must be material – the existence of only "some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." Anderson, 477 U.S. at 247-48.

When deciding a summary judgment motion, a court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor.

Id. at 255; Hunt v. City of Los Angeles, 638 F.3d 703, 709 (9th Cir. 2011).  However, when a non-moving party fails to produce evidence rebutting defendants' showing, then an order for summary adjudication is proper.  Nissan Fire, 210 F.3d at 1103 ("If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment.")

**B.  Analysis**

The parties' arguments generally fall into three parts.  First, they dispute whether the First Amendment, executed concurrently with the 2015 Loan Agreement between CAF and Najarian Holdings, operated as a release of plaintiffs' claims.  Second, they dispute whether the $250 release fee charged at the conclusion of each Advance was authorized by the terms of the Loan Documents.  And third, they dispute whether the late fees CAF imposed as liquidated damages were unenforceable penalties in violation of California law.  These points are addressed in turn.

**1.  2015 Release**

Under California law, "[t]he language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." Cal. Civ. Code § 1638.  Release agreements are interpreted using general principles of contract interpretation. See e.g., Winet v. Price, 4 Cal. App. 4th 1159, 1166 (1992).  "If contractual language is clear and explicit, it governs." Bank of the West v. Superior Court, 2 Cal. 4th 1254, 1264 (1992).  Releases "regulate and settle only such matters and differences as appear clearly to be comprehended in them by the intention of the parties and the necessary consequences." Folsom v. Butte Cty. Assn. of Governments, 32 Cal. 3d 668, 677 (1982).  "[A] general release can be completely enforceable and act as a complete bar to all claims (known or unknown at the time of the release) despite protestations by one of the parties that he did not intend to release certain types of claims." San Diego Hospice v. Cnty. of San Diego, 31 Cal. App. 4th 1048, 1053 (1995).  Unless "there is any evidence that the releasee has not dealt fairly with the releaser," the release is enforceable according to its terms. Dubois v. Sparrow, 92 Cal. App. 3d 290, 298 (1979).

7

1    The 2015 Release provided in relevant part:

> Borrower and Guarantor . . . , for themselves and on behalf of each and all of their respective parent companies, subsidiaries, affiliates, successors, assigns, beneficiaries and heirs . . . (individually and collectively, together with the Loan Parties referred to in this Section 8 as[] "Releasor"), . . . hereby fully, forever, and irrevocably release, discharge and acquit each of . . . Lender, . . . and . . . [its] successors, heirs, and assigns, . . . of and from any and all rights, claims, . . . liabilities, . . . breaches of contract, . . . cause or causes of action, . . . contracts, controversies, promises, damages, costs, losses and expenses of every type, kind, nature, description or character whatsoever, . . . including, without limitation, any and all Claims arising from or in connection with, or otherwise related to, the Loan, Advances under the [October 3, 2014] Loan, and/or the Loan Documents, and/or the transactions contemplated thereby.

Dkt 75-2 at 64-65. Defendant correctly argues that plaintiffs have failed to proffer any evidence creating a triable issue of fact on the affirmative defense of the 2015 Release. While Mr. Najarian's declaration provides that he did not (1) consult with counsel before signing the First Amendment; (2) understand that he was affecting any rights of Najarian Capital by signing the First Amendment; or (3) know that plaintiffs could assert the claims they have asserted in this lawsuit (Dkt. 77 ¶ 4), his subjective intent is insufficient to overcome the unambiguous language in the 2015 Release. Mr. Najarian's declaration contradicts the express terms of the First Amendment, that he "has had full opportunity to review th[e First] Amendment, including th[e 2015] Release, **with its legal counsel** and fully understands all of the terms and provisions hereof, and is fully aware of its content and legal effect." Dkt. 75-2 at 65 (emphasis added). Such parol evidence is not admissible where it does not support a "reasonably susceptible" meaning of the contract. Winet, 4 Cal. App. 4th at 1167. Rather, it is plainly *inadmissible* where it is offered to "flatly contradict the express terms of the agreement." Id. at 1167. Plaintiffs offer no evidence to prevent the court from giving effect to the express terms of the 2015 Release.

To the extent plaintiffs argue that the 2015 Release contravenes public policy because it released claims under an agreement containing illegal liquidated damages

8

provisions, plaintiffs have failed to establish that the late fee provisions of the 2014 Loan Agreement are in fact illegal. This issue is addressed more in depth below.

The 2015 Release applies not only to Najarian Holdings as the contracting entity, but it also applies to its "affiliates." Dkt 75-2 at 64. Defendant offered the following uncontroverted evidence: (1) Najarian Capital and Najarian Holdings conduct the same business and are essentially the same company; (2) Najarian Holdings was a single-purpose entity created solely at CAF's request to create separate credit facilities for plaintiffs; (3) Mr. Najarian owns and controls both plaintiffs; and (4) both entities share a principal office address and the same registered agent. Dkt. 75-1 at 105-106. The foregoing factors support a finding that Najarian Holdings and Najarian Capital are subject to common control and are affiliates as a matter of California law. Otay Land Co., LLC v. U.E. Ltd., L.P., 15 Cal. App. 5th 806, 856-57 (2017). Plaintiffs' operative complaint refers to both entities interchangeably as "Najarian," further reflecting that the entities are closely tied. See TAC ¶¶ 6-10, 12, 19-33. Based on all these factors, the court finds that Najarian Capital is an affiliate of Najarian Holdings, and the 2015 Release therefore applies to both plaintiffs.

Plaintiffs released all of their claims under the 2014 Loan Documents when Najarian Holdings and Mr. Najarian executed the First Amendment, and by its own terms, the 2015 Release is a complete defense to plaintiffs' remaining claims in this action. Plaintiffs' claims are premised solely on the 2014 Loan Documents. TAC ¶¶ 5-6. Therefore, plaintiffs' claims are barred, and defendant is entitled to judgment. Plaintiffs' claims also fail on the merits as discussed below.

**2.    Release Fees**

Plaintiffs allege that CAF breached the 2014 Loan Documents and the implied covenant of good faith and fair dealing by charging a $250 pass-through release fee for each Advance it issued to plaintiffs. TAC ¶¶ 26, 29. Plaintiffs contend that the release fees were not authorized by the loan documents. TAC ¶ 26.

Section 3.3 of the Note provides, in relevant part:

> Borrower shall pay to Lender all other fees as and when required pursuant to the Loan Documents. In addition to any Cash Advance Fee, Borrower shall pay to Lender, on or prior to closing of the Loan, all closing costs and other fees and expenses incurred by Lender in connection with the Loan (including appraisal fees, title insurance premiums, escrow fees, recording fees, cost review and legal fees), as more particularly set forth in Section 10.8 of the Loan Agreement.

Dkt. 75-1 at 51. And Section 10.8 of the Loan Agreement provides:

> Payment of Expenses. Borrower shall pay on demand all costs and expenses of Lender in connection with the negotiation, preparation, execution, delivery, administration, amendment, waiver and enforcement of the Loan Documents and any workouts or other matter related thereto and any litigation or dispute with respect thereto (including, without limitation, any bankruptcy or similar proceeding), including, without limitation, attorneys' fees and disbursements and fees and costs of any consultants to Lender. This Section 10.8 shall survive closing of the Loan and repayment thereof.

Dkt. 75-1 at 37. Plaintiffs are correct in their charge that the fee was not authorized to the limited extent that the Loan Documents do not include a specific fee labelled "release fee." But as defendant describes, it is "undisputed" that "a cost was incurred whenever a lien release was prepared, recorded, and tracked." Dkt. 75-1 at 124, 125, 206-10, 300. The release fees, which plaintiffs admit were incurred in relation to the payoff of each Advance, were at least superficially understood to cover Cohen's costs related to administration of the Advances. Dkt. 75-1 at 124-126. Mr. Najarian testified that he understood that the release fees were intended to cover the costs for the release of liens and other costs in connection with the sale of properties, but his sole frustration through the payment of hundreds of such fees was that they were too great, that he was overpaying. Dkt. 75-1 at 125. Plaintiffs offer no authority to suggest that such frustration invalidates the fees charged. The plain language of the Loan Documents does not support plaintiffs' claim that the release fees were invalid. For this reason, it is unnecessary to consider whether the parties' conduct, including the regular payment of $250 release fees on hundreds of occasions, supported an implied contract term—the contract was unambiguous. Oceanside 84, Ltd. v. Fid. Fed. Bank, 56 Cal. App. 4th 1441, 1448 (1997)

Plaintiffs attempt to draw a narrow interpretation of the Loan Documents, limiting their liability for costs incurred to only those related to the $5 million loan facilities, but such interpretation is not supported by the record.  A review of the Loan Documents reveals that plaintiffs were obligated to pay all costs and expenses incurred by defendant in the preparation and execution of any documents, agreements, or instruments related to the property-specific Advances.  See Dkt. 75-1 at 64, 87.  Further on this point, defendant extended the credit facilities to plaintiffs essentially as a line of credit—the specific Advances disbursed by defendant actually financed plaintiffs' purchases.  The parties did not incur fees related to the $5 million lines of credit; rather, they necessarily incurred property-specific costs such as "appraisal fees," "title insurance premiums," "escrow fees," and "recording fees."  See, e.g., Dkt. 75-1 at 96.  An interpretation of plaintiff's obligation to cover such costs only in relation to the extension of a line of credit renders the terms nonsensical and leads to an absurd result.  Such an interpretation does not find support in the record or in the law, and plaintiff fails to prove its claim that the imposition of release fees constitutes a breach of contract.

### 3. Late Fees

Plaintiffs argue that the late fees charged by defendant were unreasonable penalties where they took the form of liquidated damages and they were unsupported by any reasonable endeavor on the part of defendant to estimate the fair average compensation for late payments.  California Civil Code § 1671(b) states that "a provision in a contract liquidating the damages for the breach of the contract is valid unless the party seeking to invalidate the provision establishes that the provision was unreasonable under the circumstances existing at the time the contract was made."  "A liquidated damages clause will generally be considered unreasonable, and hence unenforceable under section 1671(b), if it bears no reasonable relationship to the range of actual damages that the parties could have anticipated would flow from a breach" at the time the contract was made.  Ridgley v. Topa Thrift & Loan Ass'n, 17 Cal.4th 970, 977 (1998).  The liquidated damages amount "must represent the result of a reasonable endeavor by

the parties to estimate a fair average compensation for any loss that may be sustained." Garrett v. Coast & Southern Fed. Sav. & Loan Ass'n, 9 Cal. 3d 731, 739 (1973). "A penalty provision operates to compel performance of an act and usually becomes effective only in the event of default upon which a forfeiture is compelled without regard to the damages sustained by the party aggrieved by the breach. The characteristic feature of a penalty is its lack of proportional relation to the damages which may actually flow from failure to perform under a contract." Id. at 739 (internal citations omitted).

Both parties discuss Poseidon Dev., Inc. v. Woodland Lane Ests., LLC, 152 Cal. App. 4th 1106 (2007), as modified (July 24, 2007), a case considering the validity of a 10 percent charge imposed on late payments in an installment contract. There, the California Court of Appeal considered whether a final balloon payment was an "installment" under the relevant contractual language such that it was subject to a late-charge provision. Id. at 1113-16. Because the late-charge provision was "never intended to compensate [the lender] for the loss of use of the money due," but rather "to cover such costs as processing and accounting charges," and because administrative costs could vary wildly with the amount of a missed payment, the court held that the final balloon payment was not an installment, as that would make it an illegal and unenforceable penalty. Id. at 1115-16.

Here, defendant avers that CAF suffered a number of distinct and demonstrable injuries from plaintiffs' chronic late payments. These included the loss of use of the lender's money, as well as increased costs of obtaining funding from third-parties, increased investment risk, and increased personnel and resources dedicated to managing plaintiffs' accounts and ensuring payment of overdue amounts. Dkt. 75-2 ¶¶ 4-9. This argument tracks the language in Poseidon, even if it does not perfectly match that fact scenario. And the evidence here, taking the form of defendant's president's declaration, establishes a reasonable foundation for a proportional late charge, one smaller to comport with a tardy installment payment and accordingly larger to match the more substantial difficulties and expenses related to loss of use of the lender's money.

12

Dkt. 75-2 ¶¶ 4-9. Plaintiffs fail to proffer any evidence that the late fees imposed were unreasonable. Plaintiffs fail to overcome defendant's rationale for the late fees and fail to establish that they were unenforceable penalties.

The reasonableness of the default interest rate for a mature Advance (what the parties at various points refer to as a "principal late") requires a slightly different analysis. Defendant was permitted to charge, in the case of a late payment of Advance principal, a going-forward default interest rate "equal to the lesser of (a) the [original] Interest Rate plus twelve percent (12%), or (b) the highest rate permitted by law". Dkt. 75-1 at 53. This default late charge more closely comports with California law, which provides that a late charge, "'if the principal or interest is not paid as it becomes due' is not to be treated as a penalty, but as a contract to pay such higher rate upon and commencing with the happening of one of the contingencies specified in the note, to wit, the failure to make payment of any sum when due." Garrett, 9 Cal. 3d 731 at 736 (quoting Thompson v. Gorner, 104 Cal. 168, 170-71 (1894)). This new interest rate to be charged where the Najarian plaintiffs missed payment of a mature Advance, not merely a monthly installment payment, falls within California law. See also Altadena, 598 B.R. at 639-41.

Plaintiffs additionally attack the late fees based on defendant's failure to show that it conducted a reasonable endeavor to determine whether the late fees approximated damages resulting from late payments, but such negotiation, especially by both contracting parties, is not required by the reasonable endeavor test. Util. Consumers' Action Network, Inc. v. AT&T Broadband of S. Cal., Inc., 135 Cal. App. 4th 1023, 1035 (2006). Rather, the California Supreme Court has long upheld liquidated damages provisions in form contracts where parties exercised their business judgment and determined that damages would be impracticable to estimate. See Better Food Markets v. Am. Dist. Tel. Co., 40 Cal 2d 179, 187 (1953) (holding that the reasonable endeavor standard did not require defendant to "investigate the plaintiff's manner of conducting business"). "[T]he 'reasonable endeavor' requirement means only that a liquidated damages provision must be reasonable in light of the potential harm that could result

from a breach, as that harm could be anticipated at the time of contract formation." Altadena, 598 B.R. at 642 (citing Better Food Markets, 40 Cal. 2d at 187).

On this point, defendant offers a more compelling record. Defendant, through the declaration of its president, Hoeffel, explains the increased risks and costs it faced as a result of plaintiffs' defaults, thereby justifying its liquidated damages. Conversely, plaintiff fails to provide any evidence and thus fails to meet its burden to explain the unreasonableness of the liquidated damages charged. As defendant notes, plaintiffs did not inquire in discovery about defendant's intent or practices in calculating or charging the late fees. On this basis, plaintiff is not entitled to prevail on this issue. Given all these considerations, plaintiff fails to establish its claim that the collection of late fees in the form of liquidated damages constituted a breach of contract.

## III.  CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment (Dkt. 75) is GRANTED as to all of plaintiffs' remaining claims. Plaintiffs' motion for partial summary judgment (Dkt. 76) is DENIED.

**IT IS SO ORDERED.**

Dated: December 1, 2021

*/s/ Phyllis J. Hamilton*
PHYLLIS J. HAMILTON
United States District Judge